553 P.2d 1270

**Johnson BENALLY, Petitioner-Appellant,**

**v.**

**Roy MARCUM, Judge of the Municipal Court of the City of Farmington, and the City of Farmington, Respondents-Appellees.**

**No. 10373.**

Supreme Court of New Mexico.

Sept. 10, 1976.

**464**

Robert M. Strumor, Richard W. Hughes, Jeanne F. Franklin, Claudeen B. Arthur, Shiprock, for appellant.

Dwight D. Arthur, Farmington, for appellees.

## OPINION

MONTOYA, Justice.

The petitioner is an enrolled member of the Navajo Tribe who resides on the Navajo Reservation, within San Juan County and near the City of Farmington. The respondents are a municipal judge of the City of Farmington and the City of Farmington itself. The petitioner sought a writ of prohibition in the District Court of San Juan County on the basis of the following facts. Farmington police officers attempted to stop Benally within the city limits of Farmington for allegedly violating, in their presence, city ordinances which prohibit driving while under the influence of alcohol, driving recklessly and causing an accident involving damage to property. Eluding the police officers, Benally allegedly fled through the streets of Farmington to the Navajo Reservation. He was finally apprehended by the officers within the reservation, brought back to Farmington, in-carcerated in the city jail, and charged with the violation of the municipal ordinances mentioned. He was released on bond. Before entering a plea to the charges, Benally moved by special appearance in the municipal court to dismiss the charges for lack of jurisdiction. The motion was denied. Benally then obtained a temporary writ of prohibition in the district court prohibiting the municipal judge from proceeding in the case. Upon a hearing, however, the district court dissolved the temporary writ and dismissed the petition. Benally appeals from this order of the district court.

On appeal, Benally contends that the order of the district court was erroneous because the Farmington city police (1) exceeded their statutory powers; (2) violated the sovereignty of the Navajo Tribe; and (3) violated his constitutional rights.

We need not and do not rule on the first contention because we agree with the second, that the arrest was illegal as it violated the sovereignty of the Navajo Tribe. However, the third contention, that the arrest violated constitutional due process, is without merit. There is no allegation or evidence of lack of probable cause to arrest, police brutality, or that an arrest warrant was constitutionally required in this instance.

The arrest of Benally violated tribal sovereignty because it circumvented and was contrary to the orderly procedure for extradition from the Navajo Reservation provided for in 17 Navajo Tribal Code §§ 1001, 1002 (1970):

"§ 1001. Indian committing crime outside Indian Country—Apprehension on Reservation

"Whenever the Chairman of the Navajo Tribal Council is informed and believes that an Indian has committed a crime outside of Indian Country and is present in Navajo 'Indian Country' and

using it as an asylum from prosecution by the state, the Chairman may order any Navajo policeman to apprehend such Indian and deliver him to the proper state authorities at the Reservation boundary.

" § 1002.—Hearing; release

"If any person being arrested as provided in section 1001 of this title so demands, he shall be taken by the arresting policeman to the nearest Court of the Navajo Tribe, where the judge shall hold a hearing, and if it appears that there is no probable cause to believe the Indian guilty of the crime with which he is charged off the Reservation, or if it appears that the Indian probably will not receive a fair trial in the state court, the judge shall order the Indian released from custody."

The conclusion that control of the extradition process is inherent in the tribal sovereignty of the Navajo Tribe was also reached in the case of *State of Arizona ex rel. Merrill v. Turtle,* 413 F.2d 683, 685–86 (9th Cir. 1969), where the circuit court stated:

"The initial question presented by this case, then, is whether Arizona's claim to extradition jurisdiction over Indian residents of the Navajo Reservation is subject to the tests of non-interference with the right of tribal self-government laid down in *Williams* [*Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959)], or is free from those limitations by reason of Article IV, Section 2 of the Constitution.

"Article IV, Section 2, read literally, purports to impose upon the governor of each State a duty to deliver up fugitives charged with a crime in a sister state. The constitutional mandate requires exercise of the state's lawful jurisdiction in responding to the extradition demands of sister states, but it does not itself attempt to define the reach of that jurisdiction. We have found no authority bearing directly upon the relationship between Article IV, Section 2, and treaty-protect-

ed Indian lands and conclude that with regard to the exercise of extradition jurisdiction over Indian residents of the Navajo Reservation, the constitutional mandate must be interpreted in light of the Treaty of 1868 and the long history of the principle of retained tribal sovereignty.

"As indicated above, the historical development of this principle down to its contemporary formulation in *Williams* prohibits the State of Arizona, in the absence of specific Congressional authorization, from extending its laws or process to the Navajo Reservation if to do so would interfere with tribal self-government or impair a right granted by federal law. We have been referred to no specific Congressional action limiting the power of the Navajo tribal government to deal with the extradition of Indians resident within the Reservation or granting to the State of Arizona the authority to exercise extradition jurisdiction over such residents. In these circumstances, Arizona's right to exercise the jurisdiction claimed must be determined in light of whether such exercise would 'infring[e] on the right of reservation Indians to make their own laws and be ruled by them,' (*Williams v. Lee,* supra at p. 220 of 358 U.S., at p. 271 of 79 S.Ct.) or, as the Williams' test was characterized by the court in *Kake, Organized Village of v. Egan,* 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed. 2d 573 (1961), 'whether the application of that law would interfere with reservation self-government.' *Id.* at p. 67, 82 S. Ct., at p. 567.

"Applying these considerations, we conclude that Arizona's exercise of the claimed jurisdiction would clearly interfere with rights essential to the Navajo's self-government. The essential and intimate relationship of control of the extradition process to the right. of self-government was recognized long ago in *Kentucky v. Dennison,* 24 How. 66, 16 L.Ed. 717 (1861), holding that there is no power, state or federal, to compel a state

to perform its constitutional duty of extradition.

"Furthermore, the right of the Navajo Tribe to exercise power over Indian residents of its reservation appears to have been recognized by the federal government from the outset by the terms of the Treaty of 1868. \* \* \*"

We find this reasoning dispositive and hold that the arrest was illegal.

■ The question remains, however, whether the illegality of Benally's arrest was sufficient to divest the Farmington Municipal Court of jurisdiction to try him for the alleged offenses. In *State v. Wise,* 58 N.M. 164, 267 P.2d 992 (1954), this court held that the felony conviction of certain defendants would not be overturned on the grounds that they had been pursued from New Mexico into Texas, where they had been arrested and brought back to this State. That case has no application to the present one, however, since a felony was involved there and only misdemeanors are involved here. The common law doctrine of fresh pursuit allows a peace officer to arrest beyond the boundaries of his jurisdiction only in pursuit of a person believed to have committed a felony. *Gattus v. State,* 204 Md. 589, 105 A.2d 661 (1954); 5 Am.Jur.2d Arrest § 51 (1962). New Mexico has adopted the common law rule by statute, limiting fresh pursuit to felonies. See §§ 41–2–1—41–2–5, N.M.S.A.1953 (2d Repl.Vol. 6, 1972).

*State v. Wise,* supra, was based in part on *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), and *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886). The doctrine of those cases is that it is no defense to a criminal prosecution that the defendant was illegally brought before the court. The respondents argue that this principle should be applied to this case. New Mexico courts have recognized this rule on several occasions. See, e. g., *State v. Cochran,* 79 N.M. 640, 447 P.2d 520 (1968); *State v. Losolla,* 79 N.M. 296, 442 P.2d 786 (1968); *State v. Wise,* supra; *State v. Ford,* 81 N.M. 556,

469 P.2d 535 (Ct.App.1970); *State v. Halsell,* 81 N.M. 239, 465 P.2d 518 (Ct.App. 1970).

This jurisdictional principle, as established by *Frisbie v. Collins,* supra, and *Ker v. Illinois,* supra, has recently been the subject of criticism in view of the evolving concepts of due process. This new approach was well enunciated in *United States v. Toscanino,* 500 F.2d 267 (2d Cir. 1974). The defendant in that case was convicted of conspiracy to import and distribute narcotics and contended that the court acquired jurisdiction over him unlawfully through the conduct of American agents who kidnapped him in Uruguay, tortured him and abducted him to the United States for the purpose of prosecuting him. The case was remanded for an evidentiary hearing with respect to his allegations of forcible abduction. In reaching that result, the court questioned whether the *Frisbie* and *Ker* cases, supra, should be adhered to because they condone illegal police conduct. The court stated (500 F.2d at 275):

"In light of these developments we are satisfied that the 'Ker-Frisbie' rule cannot be reconciled with the Supreme Court's expansion of the concept of due process, which now protects the accused against pretrial illegality by denying to the government the fruits of its exploitation of any deliberate and unnecessary lawlessness on its part. Although the issue in most of the cases forming part of this evolutionary process was whether evidence should have been excluded (e. g., Mapp [*Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081], *Miranda* [*Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694], *Wong Sun* [*Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441], *Silverman* [*Silverman v. United States,* 365 U. S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734]), it was unnecessary in those cases to invoke any other sanction to insure that an ultimate conviction would not rest on governmental illegality. Where suppression of evidence will not suffice, however, we

must be guided by the underlying principle that the government should be denied the right to exploit its own illegal conduct, *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and when an accused is kidnapped and forcibly brought within the jurisdiction, the court's acquisition of power over his person represents the fruits of the government's exploitation of its own misconduct. Having unlawfully seized the defendant in violation of the Fourth Amendment, which guarantees 'the right of the people to be secure in their persons * * * against unreasonable

* * * seizures,' the government should as a matter of fundamental fairness be obligated to return him to his *status quo ante.*

"Faced with a conflict between the two concepts of due process, the one being the restricted version found in *Ker-Frisbie* and the other the expanded and enlightened interpretation expressed in more recent decisions of the Supreme Court, we are persuaded that to the extent that the two are in conflict, the *Ker-Frisbie* version must yield. Accordingly we view due process as now requiring a court to divest itself of jurisdiction over the person of a defendant where it has been acquired as the result of the government's deliberate, unnecessary and unreasonable invasion of the accused's constitutional rights. This conclusion represents but an extension of the well-recognized power of federal courts in the civil context to decline to exercise jurisdiction over a defendant whose presence has been secured by force or fraud. See *In re Johnson,* 167 U.S. 120, 126, 17 S.Ct. 735, 42 L.Ed. 103 (1896); *Fitzgerald Construction Co. v. Fitzgerald,* 137 U.S. 98, 11 S.Ct. 36, 34 L.Ed. 608 (1890)."

██ We believe that the reasoning of the *Toscanino* case, supra, is applicable to the instant case, particularly when the actions of the law enforcement officers come into conflict with the well-established right to self-government conferred upon Indians by treaty, laws and U. S. Supreme Court decisions. We are also of the opinion that due process principles can be invoked and followed to bar prosecution where it resulted from illegal law enforcement practices. This is the mandate of such cases as *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L. Ed.2d 1081 (1961); *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952); *McNabb v. United States,* 318 U. S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943).

If we are to give substance to constitutional rights, we should be ready to deter disregard of and disrespect for the law. It does not behoove any court to declare that the government may disregard the law in order to secure the conviction of a law violator. This principle was best expressed by Justice Brandeis in an oft-quoted passage from his dissenting opinion in *Olmstead v. United States,* 277 U.S. 438, 484, 48 S.Ct. 564, 574-75, 72 L.Ed. 944, 959 (1928), where he stated:

" 'The court's aid is denied only when he who seeks it has violated the law in connection with the very transaction as to which he seeks legal redress. Then aid is denied despite the defendant's wrong. It is denied in order to maintain respect for law; in order to promote confidence in the administration of justice; in order to preserve the judicial process from contamination. * * *' "

We agree that the philosophy as expressed by Justice Brandeis should be followed in the instant case. This is especially true when we consider that the Navajo Tribe has provided specific procedures for extraditing persons accused of crime from the reservation, and in view of the Navajo Tribal government's exercise of the sovereign power vested in them.

Accordingly, the decision of the trial court is reversed and it is directed to enter its order prohibiting the Farmington Municipal Court from proceeding further in this case. If the petitioner is to be tried

by the Farmington Municipal Court he must be legally arrested through the established extradition process of the Navajo Tribe, or by other legal means.

IT IS SO ORDERED.

McMANUS and EASLEY, JJ., concur.